## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ROADBUILDERS MACHINERY SUPPLY
CO., INC.,

      Plaintiff,

      v.

                                Case No. 2:22-cv-02331-HLT

SANDVIK MINING AND
CONSTRUCTION USA, LLC,

      Defendant.

## MEMORANDUM AND ORDER

Plaintiff Roadbuilders Machinery Supply Co., Inc. and Sandvik Mining and Construction USA, LLC entered into a one-year distributor sales-and-service agreement in 1999 with auto-renewal. The agreement gave Plaintiff the territorial exclusive right to market and sell surface drills manufactured by Defendant. The parties continued their contract-based relationship until Defendant sent a termination notice to Plaintiff in 2022. Plaintiff filed suit less than a month later, alleging that Defendant's termination violated the Kansas Outdoor Power Equipment Dealership Act ("KOPEDA"), K.S.A. § 16-1301 *et seq.*, and the parties' contract. Defendant contends that KOPEDA does not apply because Plaintiff's customers used its surface drills for mining instead of construction.

The case is before the Court on dueling motions for summary judgment (Docs. 105, 106). Defendant also asks the Court to strike Bryan McCoy's affidavit (Doc. 121).[1] The Court denies the motion to strike and denies Defendant's summary-judgement motion.[2] The Court finds that

---

[1]    This case involves Phil McCoy (father) and Bryan McCoy (son). The Court refers to them as Phil and Bryan for ease and clarity throughout this order.

[2]    Even if the Court struck portions of Bryan's affidavit, the result would be the same.

KOPEDA governs this case and that the uncontroverted facts show that Defendant violated KOPEDA when it terminated the agreement without good cause, without proper notice, and without the statutory opportunity to cure. The Court grants summary judgment to Plaintiff on these issues but denies it on the remaining issues. Summary judgment is not appropriate on Defendant's mitigation of damages defense or on punitive damages. A jury must decide the types and amounts of damages in this case.

## I.    BODY OF EVIDENCE

The Court typically starts summary-judgment orders with a concise statement of the factual background. That approach won't work here because Defendant contends that Bryan's affidavit is inconsistent with his deposition testimony and must be stricken from the record. The Court therefore initially resolves the motion to strike and determines the body of evidence properly before the Court.

Defendant challenges seven paragraphs in Bryan's affidavit:

- Paragraph 7: "In performance of and reliance on the Agreement Roadbuilders marketed Sandvik products, trained its sales and service force, stocked parts and equipment, and generally associated its good will with Sandvik products."

- Paragraph 10: "Sandvik never supplied and Roadbuilders never received any notice of any requirement, target or goal for market penetration or sales performance."

- Paragraph 11: "Sandvik never supplied and Roadbuilders never received any notice that Sandvik was unhappy with Roadbuilders' market penetration."

- Paragraph 13: "Sandvik never supplied and Roadbuilders never received any non-performance letter or other document criticizing market penetration."

- Paragraph 14: "Prior to termination, Sandvik never complained about Roadbuilders' facilities, sales, marketing, stocking, warranty work, service work, payment, credit, security or any other aspect of its business."

- Paragraph 17: "Sandvik never supplied and Roadbuilders never received any written notice that Sandvik had determined that Roadbuilders 'persistently' failed to meet Sandvik's written requirement for market penetration."

- Paragraph 18: "Roadbuilders did not 'consistently fail to meet the supplier's requirements for reasonable market penetration based on the supplier's experience in other identified and comparable market areas.'"

Doc. 105-1 at 2-4. Defendant argues that these statements are inconsistent with Bryan's Rule 30(b)(6) deposition testimony,[3] which means that Bryan lacks personal knowledge and is incompetent to testify about these subjects. The Court disagrees.

This issue is governed by state law because Plaintiff brings state-law claims. Fed. R. Evid. 601 ("[I]n a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision."). Both parties cite Kansas law for this motion.

Kansas law requires a witness to have personal knowledge of the subject matter. K.S.A. § 60-419. And a witness must have independent recollection. *Carter v. Carter*, 353 P.2d 499, 503 (Kan. 1960). Arguments of competency often are better viewed as arguments of credibility—matters for the jury. *See United States v. Bedonie*, 913 F.2d 782, 799 (10th Cir. 1990).

These same principles apply to submission of an affidavit by a witness. An affidavit supporting summary judgment must be made on personal knowledge, include facts that would be admissible, and show the affiant is competent. Fed. R. Civ. P. 56(c)(4). An affidavit is inadmissible under the personal-knowledge standard if "the witness could not have actually perceived or observed that which he testifies to." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006). But an inference of personal knowledge and competence is permissible if the affidavit's context makes it clear that the affiant testifies from personal knowledge. *Ray v. Core Carrier Corp.*, 2021 WL 1196444, at *3 (D. Kan. 2021) (citations omitted). Contradictions in a witness's statements do not automatically preclude a court from considering such statements.

---

[3]   Bryan testified during his deposition both in a 30(b)(6) capacity and in his personal capacity. Doc. 121 at 2.

*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001) (citation omitted). But the Court may disregard contradictory testimony if it creates a sham fact issue. *Id.*

Defendant challenges Bryan's affidavit. Defendant cites Bryan's deposition testimony, when Bryan answered several questions with "I do not know," "I do not recall," or "That's a question for Joel [Johnson]."[4] But Defendant's attacks do not overcome the presumption of competency. And Bryan's statements in his affidavit are not necessarily contradictory to his prior statements.

Competency is not a high threshold. Bryan has worked for Plaintiff all his life. He has held many positions and worked in every department. His father was the president before passing away in 2018. Bryan's deposition answers show that he did not know specific facts like how much money Plaintiff annually spent marketing Defendant's equipment. And he did not know how many of Defendant's drills Plaintiff stocked between 1999 and July 2002. He also did not remember Defendant telling Plaintiff that its equipment sales were declining. But despite Bryan's memory struggles or knowledge lapses, his affidavit demonstrates personal knowledge. He makes statements that he observed or perceived. And the statements are not so blatantly contradictory as Defendant claims. Instead, many of Bryan's statements in his affidavit are general, while the deposition questions he was asked were specific. For example, Bryan's affidavit-statement that Plaintiff marketed Defendant's products is general. But the deposition question asking whether he knew how much money Plaintiff spent marketing Defendant's equipment annually was specific. And other statements in his affidavit are more specific, while the deposition questions were general. An example of this is Bryan's affidavit-statement that Plaintiff never received notice that Defendant "was unhappy with [Plaintiff's] market penetration," compared with his deposition

---

[4]   Johnson oversaw sales of Defendant's products for Plaintiff beginning in 2017.

answer that he did not recall Defendant telling Plaintiff that it needed Plaintiff "to increase its sales performance." Defendant fails to show actual contradictions indicating an effort to create a sham issue of fact. But even if the Court did ignore the challenged statements in Bryan's affidavit, they are not material to the outcome of these motions.

## II.      BACKGROUND[5]

### A.      The parties' agreement.

Plaintiff was (and remains) a full-service equipment dealer. Plaintiff markets and sells machinery and equipment used for industrial, construction, maintenance, and utility purposes.

Plaintiff agreed in 1999 to sell and service Defendant's surface drills in Kansas and parts of Missouri. The parties agreed to a one-year contract, with automatic annual renewals "unless either party shall give written notice to the other of its intention to terminate th[e] Agreement, with or without cause, in accordance with the provisions of Section 14." Doc. 105-1 at 12. Section 14 permits termination without cause with ninety days' written notice. *Id.* at 21. It also provides for termination with thirty days' notice for cause. *Id.* And it lists events conclusively presumed to be cause, which include failure to adequately develop sales potential and the sale or transfer of ownership interest or management without Defendant's prior written approval. *Id.* at 21-22.

### B.      Plaintiff's ownership.

Phil McCoy was the president and owner of Plaintiff in February 2006. He was Plaintiff's largest shareholder and held 44% of the outstanding stock in 2006. He had the ultimate authority over day-to-day operations as president. Phil's son is Bryan McCoy. Bryan owned 12%, and Gerry

---

[5]     For purposes of summary judgment, the following facts are uncontroverted or recited in the light most favorable to the nonmoving party. Both parties took some liberties with representing the facts supported by evidence. This complicated and slowed the Court's review of the evidence.

Buser owned 11% in February 2006. Phil passed away in 2018, and Bryan became the largest shareholder. Bryan also became president after the death of his father.

## C.  Plaintiff's performance under the agreement.

Plaintiff sells heavy equipment to several industries, including mining, construction, and aggregate production. Aggregate production involves workers drilling, blasting, and crushing rock to gravel or other sizes of aggregate product. "Aggregates are crushed, man-made stone fragments, typically produced by crushing larger rocks in quarries. Limestone aggregates are a primary rock used in ready-mix concrete, road construction, and railroads." Doc. 125-1 at 2.

Plaintiff sold Defendant's "Top Hammer Surface Drill Rigs." The machines look like this:



Plaintiff's customers used the equipment for aggregate production. But Defendant's website identifies numerous other uses for its surface drill rigs, including road and railroad construction; demolition; production in large quarries, open pit mines, and construction work sites; and blasthole drilling in mining, quarry, and construction industries.[6]

---

[6]     Plaintiff asks the Court to take judicial notice of Defendant's web pages. Doc. 124 at 11 n.1. Defendant responds that the website speaks for itself but doesn't contest whether the Court can take judicial notice of the website content. Doc. 133 at 3. In the end, the content of Defendant's website does not make a difference in the outcome

The construction market is dependent on aggregate. Defendant's surface drill sales manager Avery Martin testified that he works with the aggregate industry, meaning that if housing start-ups drop, the market could contract. He also explained that "[a]ggregate is—it's an easy way to separate mining and construction. So aggregate is aggregate-producing quarries whether on the surface or underground. Mining means metals mining which I don't get involved with." Doc. 125-6 at 258.

Stephen Gorsuch is Defendant's key accounts and distribution manager for the United States. Gorsuch testified that one of Defendant's dealers had both "surface drilling for construction" and "surface drilling for mining." Defendant was working on amending its agreement with that dealer to allow the dealer to sell surface mining equipment exclusively for coal and phosphates in Utah and Wyoming. Doc. 125-10 at 51-52.

Plaintiff and Defendant began with a good working relationship. The total market for all surface drills (sold by all manufacturers) is between two to four units per year.[7] It is unclear how many units Plaintiff sold over time, but Defendant discussed Plaintiff's "underperformance" with Plaintiff in August and September 2020.

Defendant was not one of Plaintiff's top ten original equipment manufacturers ("OEMs") in 2017. Out of twenty-three OEMs, Defendant was in the bottom five of Plaintiff's OEM brands. Defendant contends that Plaintiff's sales declined over the last five years of their relationship. Plaintiff has a different view. But the Court assumes for purposes of these motions that Defendant met with Plaintiff in August 2020. Defendant says the purpose was to review Plaintiff's sales

---

of the case. But judicial notice of the content appears appropriate under Fed. R. Evid. 201(b)(2) and *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224-25 (10th Cir. 2007).

[7]   Buser was Plaintiff's vice president until June of 2020, and he testified that the market size was three or four units per year but that the number could fluctuate.

performance. Plaintiff contends the purpose was to discuss the current business, obtain an updated distribution agreement, and introduce Josh Clymer (new business employee) to Defendant's management. Defendant displayed a slideshow during the meeting that contained charts showing a decline in Plaintiff's equipment sales from 2017-2020. The parties met again in September 2020, and Defendant displayed a slideshow showing a decline in Plaintiff's parts sales over the same time period. Defendant's Parts and Service Sales Representative Jeff Dudley sent an email to several of Plaintiff's and Defendant's representatives following the September meeting. The email contained his notes from the meeting and included one of the parts invoicing charts from the second slideshow. The email also included an agenda with items such as "[s]hare some high-level numbers on Parts Sales over the last several years according to our data" and "[d]iscuss some key opportunities I might be able to assist in a short term with your organization." Doc. 107-13 at 3.

Ultimately, the reason for the meetings is immaterial. Defendant contends that Plaintiff's performance didn't improve. Plaintiff contends that it sold three machines in 2021 and had other sales in progress the first half of 2022.

### D.   Termination of the agreement.

Defendant sent Plaintiff a termination notice on July 25, 2022. Bryan sent Martin an August 4 email asking whether Defendant's termination decision was a "final decision." Martin responded in an August 11 email that the decision was final. He explained:

> The lack of unit sales is one of the main drivers for the decision which should have been something RBM would have been able to identify. In my opinion, RBM has not focused on the drill business for quite some time and the numbers prove it. Even when Paul Painter and I came up in late 2019 or early 2020, when asked what your market share was we were advised that it was 70% and we all know that is not the case.

Doc. 107-19 at 2.

Bryan did not respond to Martin's statements. And the parties didn't have any further direct communication. Martin testified in his deposition that Defendant terminated Plaintiff solely because of under-performance on capital goods and aftermarket.

**E.    Defendant's offer of reinstatement.**

Plaintiff filed suit against Defendant eight days later, on August 19, 2022. Defense counsel offered to reinstate Plaintiff on September 21, 2022, before filing Defendant's answer. The parties dispute whether there were conditions attached to the offer. But Defendant sought an extension of time to answer in this lawsuit based on continued settlement discussions. Defendant answered the complaint on October 13, the same day Plaintiff emailed a settlement offer to Defendant. Defendant memorialized the September 21 offer in writing on November 14, 2022. Plaintiff claims that in the November 14 letter, Defendant represented that Defendant terminated Plaintiff "after years of significant decline in performance" and after giving Plaintiff notice that its performance was unsatisfactory. Doc. 125-22. *But see* Doc. 107-20 (November 14 letter from defense counsel, which does not include the quoted language). Plaintiff did not accept Defendant's offer to reinstate.

**F.    Defendant's knowledge of KOPEDA.**

Plaintiff did not immediately claim that Defendant's termination violated KOPEDA. Plaintiff first raised KOPEDA when it filed suit. Martin, Gorsuch, Ville Keinanen, and Taylor Siegel made the decision to terminate Plaintiff. Martin had a general awareness of state dealer-protection laws at the time. Gorsuch and Keinanen claim they did not know about Kansas dealer-protection laws before Plaintiff filed suit. But they were also executive employees who participated in meetings with Painter, who said dealer laws were discussed in those meetings. Siegel was in-house counsel at the time Defendant terminated Plaintiff. He had limited involvement in the termination decision.

9

## III.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Courts applying this standard view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

## IV.    ANALYSIS

Plaintiff and Defendant address overlapping issues in their briefs. The issues come down to five questions: (1) does KOPEDA apply to the parties' relationship, (2) did Defendant give the required notice, (3) can Defendant rely K.S.A. § 16-1306(a) for its termination, (4) was Plaintiff required to mitigate damages, and (5) is there a triable issue on punitive damages. The Court answers each below.

### A.    Does KOPEDA apply to the parties' relationship?

The first question is whether KOPEDA applies to the parties' relationship.[8] The Kansas legislature passed KOPEDA in 1991 to regulate the relationship between Kansas dealers of outdoor power equipment and their suppliers. The statutory scheme supplements agreements. K.S.A. § 16-1310. KOPEDA's purpose is:

---

[8]    Plaintiff's motion discusses whether Georgia or Kansas law applies. Defendant's briefs barely acknowledge the issue, but the pretrial order indicates that the parties disagree on which law applies. Nevertheless, neither party points out any meaningful differences between each state's law. And both parties agree that if an outdoor power equipment act applies, it is Kansas's. The Court determines that KOPEDA applies and utilizes Kansas law.

> to prevent arbitrary or abusive conduct and to preserve and enhance the reasonable expectations for success in the business of distributing outdoor power equipment. The retail distribution of outdoor power equipment, as defined in this act, utilizing independent retail businesses operating under agreements with suppliers, vitally affects the general economy of the state, public interest, and public welfare, and it is necessary to regulate the business relations between the independent retailers and the outdoor power equipment suppliers.

K.S.A. § 16-1301. The statutory scheme specifically provides that it must be "interpreted liberally, with regard to the equities of the retailer . . . ." *Id.* § 16-1302(f).

KOPEDA promotes public policy. This means that Kansas courts will apply KOPEDA even when it conflicts with a contractual provision. *See St. Paul Surplus Lines Ins. Co. v. Int'l Playtex, Inc.*, 777 P.2d 1259, 1257 (Kan. 1989). Allowing Defendant to contract around the statutory protection for retailers would violate the public policy of Kansas. Defendant does not materially challenge this premise. Instead, Defendant focuses on whether KOPEDA covers the equipment at issue, arguing that Plaintiff's customers use the equipment for mining and that KOPEDA does not address mining use. The Court turns to that matter next.

Statutory interpretation begins with the language of the statute. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340-41 (1997). Where the language is plain and unambiguous, interpretation of the statute starts and ends there. *See id.* Neither party argues the statute is ambiguous. The Court looks to the statutory language and construes it in accordance with the plain meaning and definitions of the words used.

KOPEDA offers certain protections to "retailers." It defines "retailer" as a business enterprise "engaged in the business of (1) [s]elling or leasing outdoor power equipment to the ultimate consumer thereof; and (2) repairing or servicing outdoor power equipment." K.S.A. § 16-1302(b). KOPEDA defines "outdoor power equipment" as "machinery, equipment,

11

attachments or repair parts therefor, used for industrial, construction, maintenance or utility purposes." *Id.* § 16-1302(a). Merriam-Webster's New Collegiate Dictionary (1979) defines the related terms as follows:

> Industrial (n.) - "1a: one that is employed in industry"; "1b: a company engaged in industrial production or service"
>
> Industry (n.) - "1b: a distinct group of productive or profit-making enterprises"
>
> Construction (n.) - "1a: the process, art, or manner of constructing something; also: a thing constructed."
>
> Construct (v.) - "1: to make or form by combining or arranging parts or elements: BUILD"

The undisputed facts show that the surface drill rigs fall under KOPEDA. There is no dispute over how the equipment works or what it does. It is uncontroverted that Plaintiff sells heavy equipment to customers in the construction, mining, and aggregate production industries. "Aggregate production" consists of a "rock quarry" where workers "drill and blast and use a crusher to crush rock down to gravel" or "different sizes of aggregate product for different uses." Doc. 107 at 3. "Limestone aggregates are a primary rock used in ready-mix concrete, road construction, and railroads." Doc. 124 at 2. Plaintiff's customers use surface drill rigs to drill holes and blast rock. The customer then uses other equipment to break the rock down further for aggregate production use.

Consistent with these uses, Defendant's website lists the uses of surface drill rigs as varied, including construction and omitting mining. Its employees also discussed the use of surface drill rigs during their depositions as being used in the construction industry. *See, e.g.*, Doc. 125-7 at 125; Doc. 125-6 at 258. And Martin distinguished between aggregate production and mining in his deposition, stating: "Aggregate is—it's an easy way to separate mining and construction. So

aggregate is aggregate-producing quarries whether on the surface or underground. Mining means metals mining which I don't get involved with." Doc. 125-6 at 258. The uncontroverted evidence indicates that the surface drill rigs are used for both construction and industrial purposes.[9] KOPEDA therefore applies.

Defendant argues that KOPEDA doesn't apply on its face because Plaintiff sells its surface drill rigs to customers who exclusively use them for aggregate production (which it contends is mining) and neither aggregate production nor mining are included in KOPEDA. Defendant points out that other states' legislatures have explicitly included mining uses in their definitions of "heavy equipment." *See, e.g.*, *Ward Cnty. Appraisal Dist. v. EES Leasing LLC*, 563 S.W. 3d 203, 206 (Tex. 2018); O.C.G.A. § 10-1-731 (Georgia). And Defendant contends that the Kansas legislature's intent to limit its "outdoor power equipment" definition to only those specified uses is demonstrated by its passage of two other acts, which specifically address "farm equipment" and "lawn/garden equipment."

Defendant ignores the broad application of the statute and its own representations of the uses of surface drill rigs. The absence of a specific reference to mining or aggregate production in the statute does not narrow the definitions of the uses that are identified: construction and industrial (plus others). Both mining and aggregate production are industries and are subsumed by construction and industrial uses. Defendant identifies no textual support for carving out mining or aggregate production. And the fact that Kansas also has farm equipment and lawn/garden equipment statutes does not suggest that the legislature intended to exclude any use not named by statute. To the contrary, the adoption of multiple laws evinces an intent to ensure that all

---

[9] Even if Plaintiff sells equipment that is classified as equipment for mining, it is still industrial equipment because mining is an industry.

dealerships in the outdoor power equipment realm have the same protections. KOPEDA is broad and the purpose is clear: "to prevent arbitrary or abusive conduct and to preserve and enhance the reasonable expectations for success in the business of distributing outdoor power equipment." K.S.A. § 16-1301. And the legislature instructed that KOPEDA is to be "interpreted liberally." Defendant's arguments that KOPEDA does not apply to its relationship with Plaintiff are unavailing.

The Court determines that KOPEDA applies to the relationship between Plaintiff and Defendant. This issue is resolved in favor of Plaintiff and against Defendant.

**B.      Did Defendant give the notice and opportunity to cure required to terminate the agreement?**

The next issue is whether Defendant properly gave Plaintiff notice of termination and opportunity to cure as required by KOPEDA. There are two KOPEDA provisions at issue. First, Defendant claims that it terminated the contract for good cause under K.S.A. § 16-1306(h), which contains its own notice requirements. Second, Defendant claims that even if its good cause didn't meet the "automatic good-cause" situations delineated in § 16-1306(a)-(h), it gave the notice and curative opportunity required by K.S.A. § 16-1307(a). Plaintiff moves for summary judgment and claims that Defendant lacked good cause to terminate the contract and did not give the required notice or opportunity to cure. Defendant moves for summary judgment and claims that it had good cause to terminate under multiple statutory provisions and that it gave plenty of notice and opportunity to cure. The issues overlap somewhat because of the statutory language. The Court addresses both good cause and notice together.

1.      **Notice for K.S.A. § 16-1306(h) good-cause termination**

Defendant argues that it had statutory good cause to terminate the agreement because of Plaintiff's poor market penetration. Defendant bears the burden to show good cause.[10] *See Bosche v. Lear Petroleum Expl., Inc.*, 816 F.2d 1460, 1463 (10th Cir. 1987); *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 534-35 (8th Cir. 2006); *cf. Unified Sch. Dist. No. 434, Osage Cnty. v. Hubbard*, 868 P.2d 1240, 1242 (1994) (placing burden on school board to terminate a tenured teacher).

K.S.A. § 16-1306 defines good cause as "failure by a retailer to substantially comply with essential and reasonable requirements imposed upon the retailer by the contract if such requirements are not different from those requirements imposed on similarly situated dealers either by their terms or in the manner of their enforcement." The statute also identifies eight additional situations where good cause exists, including the following performance-based reason:

> following <u>receipt</u> of <u>written notices</u> of the <u>supplier's requirements</u> and of <u>written notices</u> of the <u>supplier's determination</u> of the retailer's <u>initial and persisting failures</u> to meet the supplier's requirements, the retailer has <u>consistently failed</u> to meet the supplier's requirements for <u>reasonable market penetration</u> based on the <u>supplier's experience in other identified and comparable market areas</u>.

K.S.A. § 16-1306(h) (emphasis added). Subsection (h), upon which Defendant relies, requires receipt of written notices as a prerequisite to finding good cause under the subsection. The Court again looks to the plain language of the statute to determine what was required of Defendant to terminate on this basis. Merriam-Webster's New Collegiate Dictionary (1979) defines the related terms as follows:

> Receipt (n.) - "2: the act or process of receiving"

> Receiving (v.) - "1: to come into possession of: ACQUIRE"

---

[10]    Defendant does not contest where the burden lies. Doc. 123 at 16.

> Requirement (n.) – "something required: a: something wanted or needed: NECESSITY . . . b: an essential requisite: CONDITION"

Defendant does not meet its burden to show good cause based on subsection (h).[11] First, no reasonable jury could find that Plaintiff received "written notices of the supplier's requirements" from Defendant. The PowerPoint slides Defendant displayed to Plaintiff in the August and September 2020 meetings do not fulfill this requirement. Instead, the slides shown during the August 2020 meeting consist of the following: (1) a title page stating "Road Builders Overview, 2017-2020"; (2) a one-page chart of Plaintiff's (declining) sales by division for 2017, 2018, 2019, and 2020; (3) a one-page chart of Plaintiff's quarterly sales for 2017-2020; and (4) a one-page chart of sales by division for the four years, broken out by "P&S," "SUDEX," and "Rock Tools." Doc. 107-12. The slides shown in the September 2020 meeting show parts sales with similar trends, broken out by average invoicing per unit and 2017-2020 sales by "portfolio group." Doc. 107-14. The slides do not identify Defendant's requirements. The slides may have visually demonstrated declining sales by Plaintiff. But the slides do not identify "something wanted or needed" by Defendant. The record is devoid of evidence of what number or value of sales Defendant wanted or needed Plaintiff to achieve.

Second, no reasonable jury could find that the slideshows constituted "written notices of the supplier's determination of the retailer's initial and persisting failures to meet the supplier's requirements." Again, the slides do not show Defendant's requirements. They also therefore do

---

[11]   One difficulty with resolving these motions is that neither party attempts to define terms. An example of this analytical gap is the term "written notices." Defendant does not explain how displaying PowerPoint slides during a meeting (even assuming a hardcopy is also available) constitutes receipt of written notices. It seems that, at a minimum, the term "written notices" contemplates formal or official documents—items that can be "received." The Court is hard-pressed to understand how slides meet that requirement. But the Court ultimately need not resolve this precise question (whether slides constitute written notices) because the slides do not contain the required information. *See Setzekorn v. Kost USA, Inc.*, 2009 WL 580796, at *2-3, n.3 (Ohio Ct. App. 2009) (avoiding the question of whether a PowerPoint constituted written notice because it did not contain the required information).

not show any determination by Defendant of Plaintiff's initial or persisting failures to meet such requirements.

Third, there is no evidence from which a reasonable jury could find that the slideshows demonstrate that Plaintiff has "has consistently failed to meet the supplier's requirements for reasonable market penetration." There is nothing in the presentations that identifies Defendant's requirements for reasonable market penetration or shows that Plaintiff has consistently failed to meet such requirements. The slides merely show Plaintiff's sales through the years.

Fourth, there is no evidence from which a reasonable jury could tell from the slides what "reasonable market penetration based on the supplier's experience in other identified and comparable market areas" is. Nothing indicates Defendant's experience in other comparable market areas. Again, the slideshows focus only on Plaintiff's sales over time.

Fifth, no reasonable jury could find that the follow-up email to the September meeting sent by Dudley met any of the requirements of § 16-1307(h). Doc. 107-13. The Court does not repeat the content of the email here. But suffice it to say, the email does not (1) identify Defendant's requirements, (2) indicate that Plaintiff has failed to meet those requirements and persists in failing to meet them, (3) mention reasonable market penetration, or (4) explain Defendant's experience in other identified and comparable market areas.

Defendant does not present evidence that it met the notice requirements of § 16-1306(h) and therefore fails to show entitlement to termination based on § 16-1306(h)'s automatic good cause. This issue is resolved in favor of Plaintiff and against Defendant.

### 2.    Notice and Curative Opportunity Under K.S.A. § 16-1307

Defendant's next argument is that it complied with § 16-1307. Defendant contends that it had good cause to terminate under the general definition of good cause in K.S.A. § 16-1306:

"failure by a retailer to substantially comply with essential and reasonable requirements imposed upon the retailer by the contract if such requirements are not different from those requirements imposed on similarly situated dealers either by their terms or in the manner of their enforcement." Termination for good cause under the general definition only requires that a supplier (1) provide notice of at least ninety days before termination, (2) state all reasons constituting good cause, and (3) provide the dealer with sixty days to cure. K.S.A. § 16-1307(a).

Defendant claims that the meetings in August and September 2020 provided ample notice and opportunity to cure before termination. Defendant presented the charts in the previously discussed PowerPoint presentations showing Plaintiff's decline in sales during these so-called "sales-review" meetings. Defendant argues that the charts constituted notice and the lengthy time before termination constituted time to cure. Defendant also points to its offer of reinstatement as another opportunity to cure. Defendant essentially seeks to take its actions in hindsight and characterize them as meeting statutory requirements that Defendant was not aware of at the time.

This argument has its own problems, primarily with notice.[12] Defendant ignores the statutory language of K.S.A. § 16-1307. The notice "shall state all reasons constituting good cause for termination." K.S.A. § 16-1307. And it "shall provide that the dealer has 60 days to cure any claimed deficiency." *Id.* Defendant failed to comply with either of these requirements. First, the content of the "sales-review" meetings is controverted. But there is no evidence that they included any statements indicating that Defendant would terminate the contract in ninety days for good cause if Plaintiff didn't increase its sales within sixty days. And if Defendant wants to use its

---

[12] The parties do not give much attention to the general good-cause provision. But even if Defendant has shown that Plaintiff failed to "substantially comply with essential and reasonable requirements imposed upon the retailer by the contract," Defendant has not pointed to any evidence showing that "such requirements are not different from those requirements imposed on similarly situated dealers either by their terms or in the manner of their enforcement."

termination letter sent July 25, 2022 as its notice, again the letter is deficient. It offers 180 days of notice. But it does not state any reasons constituting good cause or provide that Plaintiff can cure any deficiency. To the contrary, when Plaintiff asked whether the decision was final, Defendant confirmed that it was. Defendant's purported reinstatement offer is controverted in content, came after termination (and after Plaintiff filed suit), and occurred during settlement negotiation.

No reasonable jury could find that Defendant complied with the statutory notice requirements to terminate for general good cause. The Court grants summary judgment to Plaintiff and against Defendant on this issue.

**C.      Can Defendant rely on K.S.A. § 16-1306(a) for its termination, which provides that good cause exists when "the retailer has transferred a controlling interest in the retailer business without the supplier's consent"?**

Defendant argues that it had statutory automatic good cause to terminate the agreement because Plaintiff transferred a controlling interest without Defendant's consent.[13] And Defendant contends that no notice or opportunity to cure was required under this scenario. Defendant moves for summary judgment on this issue. Plaintiff does not directly move for summary judgment on the "controlling interest" issue.[14]

KOPEDA provides that a supplier conclusively establishes good cause for termination when "[t]he retailer has transferred a controlling interest in the retailer business without the supplier's consent." K.S.A. § 16-1306(a). The notice and right-to-cure provisions of K.S.A.

---

[13]    This seems to be an "unclean hands" theory, although Defendant does not phrase it as one in its briefing. Defendant preserved a "unclean hands" defense in the pretrial order. Doc. 116 at 11. To the extent that it is, Defendant has not explained how an equitable theory applies to bar a statutory claim. And to the extent that Defendant attempts to use Plaintiff's own statutory violation to estop Plaintiff from recovering on Defendant's violation, it is unclear how this theory would apply, as Defendant disavows knowing the statute existed at the time Plaintiff allegedly gave Defendant good cause to terminate. Defendant therefore could not have relied on Plaintiff's conduct.

[14]    Plaintiff asks the Court to hold that Defendant terminated the contract without good cause in violation of K.S.A. § 16-1306. Plaintiff's request indirectly begs the question whether Defendant can use § 16-1306(a) as a post hoc rationalization for termination. But it is not a specific request for summary judgment on the issue.

§ 16-1307 "shall not apply if the reason for termination, cancellation or nonrenewal is for any reason set forth in subsections (a) through (h) of K.S.A. § 16-1306."

Defendant contends that Plaintiff transferred a controlling interest without Defendant's consent when Phil died and Bryan became Plaintiff's largest shareholder and president. The parties largely center their arguments on the meaning of "transferred" and "controlling interest."[15] But there is an uncontroverted fact that is dispositive of this issue.

Both parties agree that any transfer of a controlling interest (assuming it happened) was <u>not</u> the reason for termination. Martin unequivocally testified that poor market penetration was the sole reason for termination. Martin explained to Bryan via email that "[t]he lack of unit sales is one of the main drivers for the decision which should have been something [Plaintiff] would have been able to identify." Doc. 125-1 at 49. And Gorsuch testified in his deposition that Plaintiff's termination was "[s]olely performance based." Doc. 125-10 at 141-42. Defendant contends that it doesn't matter whether a transfer of a controlling interest was the <u>real</u> reason for termination because § 16-1306(a) does not require notice of any kind, unlike termination under the general good-cause provision of § 16-1306 and notice/right to cure provision of § 16-1307(a).[16]

Both parties focus on § 16-1306(a) and ignore the plain language of K.S.A. § 16-1307(a). It specifies that no notice or opportunity to cure is required "<u>if the reason for termination,</u> cancellation or nonrenewal <u>is for any reason</u> set forth in subsections (a) through (h) of K.S.A. § 16-1306." This language leaves no room for post-hoc rationalization. *See S & H Farm Supply, Inc. v. Bad Boy, Inc.*, 2020 WL 8372961, at *4 (W.D. Mo. 2020) ("Nothing in the statute permits

---

[15]   It seems Defendant has the better argument on the definition of controlling interest after reviewing definitions for controlling interest.

[16]   There also may be some question of waiver here. But the parties to not brief the matter. It appears that Defendant knew of Phil's death some time before termination and likely before at least one renewal of the contract. The parties' agreement automatically renewed four times after Phil's death.

the manufacturer to seek out post-hoc rationalizations or rely on anything other than the actual grounds for termination."). The termination must be <u>because of</u> the transfer of a controlling interest under subsection (a) to remove the necessity of proper notice and opportunity to cure. The statute does not say that a supplier is excused from the notice and curative requirements if a reason in subsections (a) through (h) <u>existed</u>. It requires that the termination <u>is</u> for a reason in subsections (a) through (h). Defendant acknowledges that any shift in control from Phil to Bryan was <u>not</u> the reasons it terminated the agreement. Martin wrote an internal email on August 16, 2021 noting that Plaintiff "has an old contract. The original owner died over 3-years ago and they need a new contract because of change in ownership." Doc. 123-13 at 2. This email indicates a desire to continue the relationship with Plaintiff despite Phil's death; not terminate the relationship.

This issue is resolved against Defendant. The Court denies Defendant's motion on the issue. Although Plaintiff did not specifically move for summary judgment on good cause under § 16-1306(a), there is no issue for the jury to resolve, and Plaintiff <u>did</u> move for summary judgment on the good-cause issue in general. The Court therefore grants Plaintiff's motion for summary judgment on liability for Count 1 because Defendant did not have good cause for termination.

### D.   Was Plaintiff required to mitigate damages?

The remaining issues relate to damages. Defendant contends that Plaintiff is barred from recovery because Defendant promptly offered to reinstate Plaintiff but Plaintiff refused. Plaintiff asks the Court to grant it summary judgment on Defendant's mitigation of damages affirmative defense. Plaintiff claims it had no duty to mitigate its damages because KOPEDA contains a specific remedy provision. *See Town & Country Equip., Inc. v. Massey-Ferguson, Inc.*, 808 F. Supp. 779, 781 (D. Kan. 1992). Plaintiff additionally argues that common law mitigation does not bar recovery; it only reduces recovery.

Kansas law requires injured parties to mitigate damages. *See Fed. Deposit Ins. Corp. v. Ashley*, 749 F. Supp. 1065, 1068 (D. Kan. 1990) (citing *Home Life Ins. Co. v. Clay*, 773 P.2d 666, 674 (1989)). So does Georgia law to the extent that it applies.[17] *See Gen. Elec. Cap. Corp. v. Nucor Drilling*, 551 F. Supp. 2d 1375, 1381 (M.D. Ga. 2008). The question is whether these common-law requirements apply to KOPEDA's statutory scheme, and, if so, what Plaintiff reasonably must have done to satisfy the requirements.

Whether mitigation is available as an affirmative defense to a violation of KOPEDA (and, if so, its impact) is unclear under Kansas law. The parties have devoted some of their briefing to it. But the Court suspects there is more to this Kansas-law issue than is facially apparent.[18] Mitigation is a common-law doctrine. KOPEDA does not overtly address it. But KOPEDA permits retailers remedies in addition to statutory remedies. K.S.A. §§ 16-1308, 16-1310. And it does not specify legal options available to suppliers. It is, at a minimum, somewhat counterintuitive that the legislature would intend to allow a supplier to wholly bar a KOPEDA claim by quickly offering to reinstate a retailer after the retailer legally challenges a termination without good cause. This outcome seems somewhat inconsistent with the purpose of KOPEDA, which leans toward protecting retailers. But determining what the Kansas legislature intended is challenging and requires more analysis and consideration than the Court is prepared to undertake at this time and on the briefs before it. The mitigation issue is only one of many raised by the competing summary-judgment motions.

---

[17]   Both parties only address Kansas law on mitigation.

[18]   One example of a potential layer that the parties haven't addressed is whether an equitable remedy (Defendant's proffered reinstatement) can mitigate damages where the only remedy Plaintiff seeks is money damages, not equitable relief. This may or may not be problematic. The Court makes no determination on the matter. But the question demonstrates another level of analysis that may be required to resolve the mitigation issue.

It also seems likely that the issue may be resolved as an evidentiary one instead of a legal one.[19] Defendant claims that Plaintiff failed to mitigate damages because Plaintiff did not accept Defendant's offer of reinstatement. There is a question of whether Defendant's offer was unconditional or reasonable under the circumstances for Plaintiff to accept. But even if it was, there is an evidentiary question of whether evidence of the offer is admissible under Rule 408.[20] The mitigation issue therefore may be capable of resolution without resorting to a prediction of what the Kansas Supreme Court would decide about KOPEDA.

For these reasons, the Court determines that resolution of this issue is better saved for closer to trial. By way of this order, the Court has narrowed the issues in dispute. The Court suspects that more targeted briefing, including a more robust analysis of whether evidence of Defendant's offer to reinstate is admissible at all, would be beneficial. The Court is not inclined to rule on a difficult issue of state law when the evidence may not even be admissible. Defendant will need to explain how an equitable remedy (offer of reinstatement) may apply in an action for monetary damages. Perhaps it does, but the Court will not presume that it does without explanation. And if the evidence is admissible and if common-law mitigation applies to this statutory scheme, the Court would like to see analysis from the parties, with caselaw citations, on whether mitigation acts as an absolute defense to liability or as a factor in calculating damages. *See, e.g.*, *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261 (5th Cir. 2020). The Court denies both parties' motions on Defendant's affirmative defense of mitigation.

---

[19]   Despite the fact that both parties moved for summary judgment on this issue, the Court questions whether it should have been raised as an evidentiary matter instead of a summary judgment matter. *See Mastec N. Am., Inc. v. Coos Cnty.*, 2007 WL 2027011, at *8 (D. Or. July 2007) ("Ultimately, whether plaintiffs can introduce their May 24 offer to show Coos County's failure to mitigate damages is an evidentiary issue properly raised in a motion in limine rather than a motion for summary judgment.").

[20]   There appears to be a split of authority on this matter, further complicating resolution. *See Scavetta v. King Soopers, Inc.*, 2013 WL 2393070, at *2 (D. Colo. 2013) (citing cases and noting an absence of binding authority).

**E.**      **Is Plaintiff's claim for punitive damages viable?**

Finally, Defendant asks for summary judgment on Plaintiff's request for punitive damages. Defendant contends that it had no knowledge of KOPEDA before Plaintiff filed suit. Defendant maintains that it believed only the parties' agreement governed their relationship. The agreement contains its own termination mechanism, which Plaintiff has never challenged.

An entitlement to punitive damages requires clear and convincing evidence that a defendant acted with "willful conduct, wanton conduct, fraud, or malice." K.S.A. § 60-3702(c). Clear and convincing is a high standard. The plaintiff must adduce evidence that is "certain, plain to the understanding, and unambiguous." *Somnograph, Inc. v. Rodman*, 2007 WL 518857, at *4 (Kan. Ct. App. 2007) (citation omitted); *see also Taylor v. The Devereux Found., Inc.*, 885 S.E.2d 671, 683 (Ga. 2023).

Four of Defendant's employees decided to terminate the relationship with Plaintiff: Martin, Gorsuch, Keinanen, and Siegel. The termination may have complied with the language in the parties' agreement. But it did not comply with Kansas state law. The uncontroverted evidence shows that Martin had a general awareness of state dealer protection laws. Gorsuch and Keinanen only learned of dealer protection laws through Plaintiff's lawsuit. And Siegel had only limited involvement in the decision and did not talk with the other three about dealer protection laws before the termination. Defendant also points to its post-termination offer to reinstate Plaintiff as evidence that it engaged in no willful or wanton conduct.

The Court determines that there remains a genuine issue of material fact as to whether Defendant can be liable for punitive damages.[21] Defendant's motion is denied on this issue.

---

[21] A more interesting question is whether punitive damages are available as a remedy when the statute provides that is incorporated into contractual terms, but claims for breach of contract are ineligible for punitive damages. Defendant has not raised this issue, and the Court declines to address it in the absence of argument by the parties.

V.      **CONCLUSION**

This case is governed by KOPEDA. The uncontroverted evidence shows that Defendant violated KOPEDA when it terminated the agreement with Plaintiff without good cause, without proper notice, and without a statutory opportunity to cure. Summary judgment is granted for Plaintiff on these issues and thus on liability. But summary judgment is not appropriate for Plaintiff on Defendant's mitigation of damages defense or for Defendant on the punitive damages issue. A jury must decide all types and amounts of damages in this case.

THE COURT THEREFORE ORDERS that Defendant's motion to strike Bryan McCoy's affidavit (Doc. 121) is DENIED.

THE COURT FURTHER ORDERS that Plaintiff's motion for partial summary judgment (Doc. 105) is GRANTED IN PART and DENIED IN PART. Defendant's motion (Doc. 106) is DENIED.

IT IS SO ORDERED.

Dated: March 14, 2024                    /s/ *Holly L. Teeter*
                                         HOLLY L. TEETER
                                         UNITED STATES DISTRICT JUDGE